A03A1072. MINOR et al. v. BARWICK et al.

(590 SE2d 754)

MIKELL, Judge.

This case is before us on interlocutory review of the trial court's denial of appellants' motions for summary judgment.[1] Brent Barwick ("Barwick") committed suicide while detained in Phillips State Prison ("Phillips"). Justin Barwick, Barwick's brother and administrator of his estate, and Richard Hyer, administrator of the estate of Sandra Barwick, Barwick's mother, filed this wrongful death action against Debbie Carter, officially and individually, Medical College of Georgia ("MCG"), Board of Regents of the University System of Georgia, Georgia Department of Corrections ("DOC"), and two of its employees, Lieutenant Stuart Minor ("Minor") and Captain Isaiah Bailey ("Bailey").[2] Plaintiffs filed suit pursuant to 42 USC § 1983,

---

[1] The trial court's summary judgment order was filed on October 24, 2002. The certificate of immediate review was signed by the trial court on November 4, 2002, but not stamped filed by the clerk's office until November 12, 2002. Because the certificate of immediate review shows on its face that it was not granted within ten days of the entry of the summary judgment order, the trial court issued a "Supplemental Order Clarifying the Record." The supplemental order states that the certificate was signed by the trial court and delivered to the clerk's office on November 4, 2002, but due to clerical error it was not stamped filed until November 12, 2002. The order concludes: "regardless of filing date, the [o]rder [granting the certificate of immediate review] was timely entered pursuant to OCGA § 5-6-34 (b)." OCGA § 5-6-34 provides that, "[w]here the trial judge in rendering [a] . . . decision . . . , not otherwise subject to direct appeal, certifies within ten days of entry thereof that the . . . decision . . . is of such importance to the case that immediate review should be had, . . . [this Court] may . . . permit [such] an appeal. . . ." OCGA § 5-6-34 (b). Here, the trial court certified its order for immediate review ten days after the order was filed and corrected the filing error. Further, plaintiffs have not sought to dismiss this appeal. Accordingly, the matter is properly before us for interlocutory review.

[2] Carter, a licensed practical nurse, was an employee of MCG assigned to Phillips. Minor was a DOC officer on duty at the time of Barwick's suicide. Bailey, also on duty at the time of Barwick's suicide, was a DOC officer and Minor's supervisor. At the time of Barwick's suicide, Bailey was duty officer for the week. Minor, Bailey, and Carter were sued individu-

alleging that appellants acted with "deliberate indifference" in failing to provide medical care and treatment to Barwick, in violation of the Due Process Clause and the Eighth Amendment of the United States Constitution. Plaintiffs also alleged claims of medical malpractice, violation of OCGA § 42-5-2,[3] breach of contract, and wrongful death and negligence. The parties filed cross-motions for summary judgment. The trial court denied plaintiffs' motion and granted and denied in part defendants' motion. The court denied Minor's motion for summary judgment on plaintiffs' wrongful death claim, finding that even though Minor was acting within the scope of his employment and performing discretionary acts when dealing with Barwick, a question of fact exists for the jury as to whether Minor acted with malice or intent to injure Barwick. The trial court also denied Minor's motion for summary judgment on plaintiffs' claim that Minor breached his duty under OCGA § 42-5-2. Finally, the trial court denied both Minor's and Carter's motions for summary judgment on plaintiffs' § 1983 claim, finding that a question of fact exists for the jury as to whether Minor and Carter acted with deliberate indifference. The trial court granted a certificate of immediate review of its rulings with respect to Minor and Carter. For reasons that follow, we reverse the trial court's decision as to Minor, but affirm the judgment as to Carter.

> To prevail at summary judgment under OCGA § 9-11-56, the moving party must demonstrate that there is no genuine issue of material fact and that the undisputed facts, viewed in the light most favorable to the non-moving party, warrant judgment as a matter of law. OCGA § 9-11-56 (c). A *defendant* may do this by showing the court that documents, affidavits, depositions and other evidence in the record reveal that there is no evidence sufficient to create a jury issue on at least one essential element of [the] plaintiff's case. . . . Our review of an appeal from summary judgment is de novo.

(Citations omitted.) *Vasquez v. Smith*, 259 Ga. App. 79 (576 SE2d 59) (2003). See also *Willett v. Russell M. Stookey, P.C.*, 256 Ga. App. 403, 410 (568 SE2d 520) (2002).

Viewed in this light, the evidence shows that Barwick arrived at Phillips, a DOC facility, on July 6, 1998, to serve time for a parole violation. On August 30, 1998, Barwick attempted suicide by cutting

---

ally. Justin Barwick filed suit on September 29, 2000. Hyer filed suit on December 22, 2000. On July 18, 2002, the trial court consolidated the two actions.

[3] OCGA § 42-5-2 provides that "[t]he officer in charge will provide an inmate access to medical services or hospital care." OCGA § 42-5-2 (b) (1).

his foot on his cell toilet. Barwick was treated for the injury and housed at Phillips' Crisis Stabilization Unit until September 3, 1998. Medical staff subsequently released him to a mental health building where inmates are allowed to self-medicate with Tylenol. The medical staff at Phillips delivered the Tylenol to Barwick's building and security staff dispensed it. No log was kept documenting how many pills an inmate was given, and the inmates were not required to ingest the pills in the presence of prison personnel. There was, however, a policy limiting each inmate to two pills every four hours. Phillips had 24-hour, on-site medical care available through a contract with MCG.

According to Barwick's fellow inmates, he talked about suicide almost daily. Sometime in early September 1998, one inmate told Minor that Barwick was upset and that someone should talk to him. According to the inmate, Minor spoke with Barwick.

In late September 1998, Barwick, with the help of other inmates, collected approximately 110 Tylenol pills. Following up on rumors of hoarding, corrections officers searched inmate cells, including Barwick's, but found nothing. One inmate stated that Barwick had buried the pills outside in the yard. From September 27 through September 29, Barwick ate no food. On September 29, at approximately 10:00 a.m., Barwick ingested all 110 Tylenol pills.

Sometime that morning, Dr. John Purcell, a prison psychiatrist on his daily rounds, evaluated Barwick. The record does not indicate whether this evaluation took place before or after 10:00 a.m. Dr. Purcell concluded that Barwick did not exhibit signs of suicidal impulsiveness or of a Tylenol overdose. Dr. Purcell concluded that Barwick was doing well.

In the early afternoon of September 29, an inmate informed Stanley Kalin, a mental health counselor at Phillips and a DOC employee, that Barwick had overdosed on Tylenol. Kalin went to Barwick's cell and woke him up. Barwick appeared groggy and complained of a headache, which he attributed to standing up too fast. Kalin then took Barwick to his office, where Barwick vomited in the trash can. Barwick denied that he had taken an overdose of Tylenol. Kalin notified the medical department of Barwick's situation and Bob Jones, a nurse employed by MCG, came to Kalin's office to check on Barwick.

Jones assessed Barwick's condition and asked him if he had overdosed on Tylenol. Barwick denied the allegation, and Jones determined that no follow-up was needed.[4] Although Kalin did not

---

[4] Even though it is not relevant to this appeal, there is evidence that Jones may have falsified Barwick's medical records by recording vital signs that he never took. Jones resigned on October 6, 1998, three days after Barwick's death.

agree with Jones's conclusion and felt that a more thorough examination should be done, Kalin did not protest or object to Jones's determination. Kalin later told a range officer to keep an eye on Barwick.

In the late afternoon/early evening of September 29, Barwick's cellmate told Officer Taiwon Dowling about the overdose. Dowling went to Barwick's cell and asked him if he had taken 110 Tylenol pills. Barwick said yes. Dowling then called Sergeant Mabel Davenport and advised her of the situation.

At some point during this time, Barwick's mother called Phillips to find out what was being done to help her son. Davenport took the telephone call and then handed the phone to Minor. Minor told Mrs. Barwick to call back the next morning and that he had nothing to say to her.

Davenport then went to see Barwick. She averred that he was talking on the phone to his mother.[5] Barwick's eyes were dilated. Barwick told Davenport that he had taken 110 Tylenol pills because he wanted to die. When Davenport asked Barwick where he got the pills, Barwick said that he and his friends had collected them. Davenport took Barwick to the counselor's office and Barwick vomited while in the office. Davenport called medical personnel and Jones answered. Jones told Davenport that Barwick already had been checked and that medical personnel would not come to see him again. After the call, Davenport observed Barwick walking awkwardly and sluggishly. She again called medical personnel and demanded that they check Barwick. Jones again refused, stating that Barwick had refused treatment.

Davenport then contacted Minor and relayed her conversations with Barwick and Jones. Minor came to the office and asked Barwick what he had done. Barwick replied that he had done nothing.[6] Minor then told Barwick, "[l]isten, I don't give a fuck whether you live or die. There's more where you came from." Other security personnel heard Minor say that he did not care if Barwick died, or "well die, you little S.O.B." Minor denied making any such statements. Davenport then told Minor that it was important for medical personnel to examine Barwick. Minor called Bailey at home, and Bailey stated that medical personnel would examine Barwick.[7] Bailey then called Jones and ordered that Barwick be seen.

Carter was sent to examine Barwick. He twice denied taking an

---

[5] Officer Dowling never testified that Barwick called his mother; rather, he recalls taking Barwick to a dorm where they waited for Davenport.

[6] According to Dowling, Minor asked Barwick if he had taken 110 Tylenol pills and he said yes.

[7] Contrary to Davenport's testimony, Minor testified that he first called medical staff and spoke with Jones. After Jones refused to send medical personnel, Minor called Bailey.

overdose of Tylenol. Carter took Barwick's blood pressure and Davenport commented that it was low.[8] There is some evidence that Carter responded that Barwick's blood pressure was not dangerously low, but she denied making any such statement.[9] After further examination, Carter concluded that Barwick was fine. According to Davenport, she protested that Barwick needed to be hospitalized because he was lethargic, his eyes were dilated, and his blood pressure was low. Carter said she would not recommend that Barwick be transported out of Phillips. At this point, Minor said, "I'm done with it, I'm gone[,]" and left the room. Davenport asked Carter to take Barwick to the medical section for observation, but Carter refused. Carter denied that Davenport protested in any manner after she assessed Barwick.

Carter then called her supervising nurse, Angela Chandler. There is some evidence that Carter told Chandler of her assessment and recommended that Barwick not be transported out of the prison, but merely monitored. Carter denied that she made any recommendation regarding transport; rather, Carter relied on Chandler because she did not have the authority to order a transport. Chandler told Carter to tell security personnel to monitor Barwick. Carter relayed this message and told Davenport to put Barwick to bed. There is no evidence that Barwick requested medical treatment or to be transferred out of Phillips. Carter left, and Davenport asked Barwick why he took the pills. Barwick again responded that he wanted to die. Barwick told Davenport that he had read about overdosing in the prison library and knew that he would die in a few days.

Barwick was put to bed and security personnel allegedly checked on him throughout the night.[10] When asked, Barwick told one guard that he was feeling fine. Before her shift ended, Davenport called one of the guards and asked him to check on Barwick. The guard said that Barwick was breathing but did not look well and was not acting appropriately. Believing she had done everything she could at that time, Davenport took no further action.

At 5:30 a.m. on September 30, 2002, Barwick told a prison guard that he was not feeling well, that he was having stomach pains, and that he had taken 110 Tylenol pills. The prison guard relayed this information to medical personnel. A short time later, Nurse Gilbert Vishino arrived to examine Barwick. Vishino found Barwick in a

---

[8] Davenport recalls that Minor also commented that Barwick's blood pressure was low. Minor, however, does not remember anybody saying anything about Barwick's blood pressure. Carter denies that Davenport or Minor said that Barwick's blood pressure seemed low.

[9] Carter's notes show that Barwick's blood pressure was 100/58, his pulse was 110, and his pupils were dilated.

[10] Barwick's cellmate, who was buffing the floors of the cellblock/dormitory, does not remember anybody coming to check on Barwick until the following morning.

fetal position in bed. Barwick told Vishino that he wanted to die but did not think it would be so painful. Barwick agreed to go to the medical section. Vishino called Dr. Kenneth Sanford, a MCG employee, and apprised him of the situation. Dr. Sanford initially ordered observation but then changed his mind and ordered that Barwick be transferred to the hospital. Barwick died in the hospital at 7:15 p.m. on October 3, 1998, of acetaminophen poisoning.[11]

1. *42 USC § 1983 Claim.* Minor and Carter contend that the trial court erred in denying their motion for summary judgment on plaintiffs' 42 USC § 1983 claim because there is no evidence that they were subjectively aware of the overdose or Barwick's need for medical care, and, therefore, could not have acted with deliberate indifference. Both Minor and Carter argue that they are entitled to qualified immunity.

"Government officials, including police officers, are entitled to immunity from personal liability under 42 USC § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Citations and punctuation omitted.) *Outlaw v. Nasworthy,* 250 Ga. App. 362, 363 (1) (551 SE2d 785) (2001), citing *Harlow v. Fitzgerald,* 457 U. S. 800, 818 (102 SC 2727, 73 LE2d 396) (1982). The test for determining whether the official is entitled to immunity is the objective reasonableness of the official's conduct in light of legal rules which were clearly established at the time the action was taken. *Harlow,* supra at 818-819; *Outlaw,* supra at 364 (1). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U. S. 635, 640 (107 SC 3034, 97 LE2d 523) (1987). "On a motion for summary judgment, if the applicable law was clearly established at the time the defendant acted, the immunity defense ordinarily should fail, since a reasonably competent . . . official should know the law governing his conduct." (Citation and punctuation omitted.) *Outlaw,* supra at 364 (1), citing *Gardner v. Rogers,* 224 Ga. App. 165, 167 (1) (480 SE2d 217) (1996).

In 1976, the United States Supreme Court first recognized a

---

[11] Plaintiffs' expert testified that, according to medical and toxicology literature, Mucomyst, or N-acetylcysteine, is a hundred percent successful in preventing death from a hepatotoxicity related to acetaminophen – to an acute overdose of acetaminophen if given within eight hours of ingestion. . . . After that, its efficacy goes down progressively as time goes on. So, if Mr. Barwick had been taken to the hospital when the possibility of overdose was first realized at about 1:00, 1:30, his death would have been prevented and that even if he was taken to the hospital at around six in the evening, to a high degree of medical probability, his death would have been prevented.

cause of action under 42 USC § 1983 for failure to attend to an inmate's serious illness or injury:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

(Citation and footnotes omitted.) *Estelle v. Gamble*, 429 U. S. 97, 104-105 (97 SC 285, 50 LE2d 251) (1976). See *Howard v. City of Columbus*, 239 Ga. App. 399, 402 (1) (521 SE2d 51) (1999) ("[l]iability on an action under 42 [USC] § 1983 prohibiting cruel and unusual punishment as a violation of Eighth Amendment rights under the United States Constitution exists through 'acts [and] omissions sufficiently harmful to evidence deliberate indifference to serious medical needs,' of an inmate in jail"); *Merritt v. Athens Clarke County*, 233 Ga. App. 203, 207 (2) (504 SE2d 41) (1998) ("under *Estelle*, the constitutional violation of 'deliberate indifference' can be established only after determining two components: (1) whether evidence of a serious medical need existed, and (2) whether the defendant's response to that need amounted to deliberate indifference") (citations omitted). Thus, the general right which Minor and Carter are alleged to have violated was well established at the time of Barwick's overdose and subsequent death.

In *Farmer v. Brennan*, 511 U. S. 825 (114 SC 1970, 128 LE2d 811) (1994), the United States Supreme Court defined the test for determining deliberate indifference:

> We reject petitioner's invitation to adopt an objective test for deliberate indifference. We hold instead that a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. This approach comports best with the text of the Amendment as our cases have interpreted it. The Eighth Amendment does not outlaw cruel and unusual "conditions"; it outlaws cruel and unusual "punishments." An act or omis-

sion unaccompanied by knowledge of a significant risk of harm might well be something society wishes to discourage, and if harm does result society might well wish to assure compensation. The common law reflects such concerns when it imposes tort liability on a purely objective basis. But an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.

(Citations omitted.) Id. at 837-838. Thus, a prison official may be "deliberately indifferent" so as to give rise to a 42 USC § 1983 action if the official intentionally denies or delays a prisoner's access to medical care and such conduct results in substantial harm. See *Estelle*, supra at 104 (medical director of corrections department did not act with deliberate indifference to inmate's complaints where evidence showed that inmate was seen 17 times by medical personnel and was prescribed pain relievers and muscle relaxants); *Brown v. Hughes*, 894 F2d 1533, 1538 (11th Cir. 1990) ("an unexplained delay of hours in treating a serious injury states a prima facie case of deliberate indifference"); *Wilson v. City of Chanute*, 43 FSupp.2d 1202 (D.C. Kan. 1999) (officers who observed detainee ingest pills and saw his condition deteriorate but did nothing to provide medical assistance until detainee had gone into full respiratory and cardiac arrest acted with deliberate indifference); *Howard*, supra (jail nurses who ignored pleas to have diabetic inmate examined and/or transferred to the hospital acted with deliberate indifference). However, even if a prison official knew of a substantial risk to inmate health or safety, the official may be relieved from liability if the official responded reasonably to the risk, even if the harm ultimately was not avoided. *Farmer*, supra at 844, 847.

With regard to medical personnel, the Supreme Court clarified that, "inadvertent failure to provide adequate medical care" would not amount to a constitutional violation:

[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Estelle*, supra at 105-106.

Viewed in the light most favorable to plaintiffs, the evidence shows that both Carter and Minor were aware that Barwick faced a substantial risk of serious harm. The issue then is whether Minor and Carter deliberately disregarded this risk.

(a) *Minor*. Minor found out about Barwick's alleged overdose sometime in the late afternoon/early evening of September 29. Shortly after he was told of Barwick's alleged overdose, Minor went to see Barwick, who denied it. Even though there is some conflict about whether Minor first called medical personnel or Bailey, the evidence shows that because of Minor's efforts, Carter was sent to examine Barwick. There is no evidence that Minor intentionally denied or delayed Barwick's access to medical care, or ignored Barwick's need for medical attention. Unlike in *Wilson*, where officers did nothing, here, Minor summoned medical personnel shortly after learning of Barwick's overdose.

Plaintiffs argue that Minor should have sent Barwick to the hospital. *Farmer*, however, does not require us to decide, with the benefit of hindsight, what Minor should have done. Rather, *Farmer* requires only that we decide whether he responded reasonably to a known risk of substantial harm. In light of what Minor had been told by others, including Barwick, we cannot say that he acted unreasonably.

Plaintiffs also argue that Minor's comments that he did not care whether Barwick lived or died show that he was aware of the risk of substantial harm. We do not disagree with this argument; however, as we note above, it is not enough for plaintiffs to show Minor's knowledge of a risk of substantial harm. Plaintiffs also must show that Minor responded unreasonably to, or deliberately disregarded, a known risk of substantial harm. Though Minor's comments to Barwick may have been abusive and reprehensible, they do not obscure the fact that Minor summoned medical personnel shortly after learning of the overdose. Because plaintiffs have not shown that Minor displayed deliberate indifference to Barwick's serious medical needs, the trial court erred in denying Minor's motion for summary judgment on plaintiffs' 42 USC § 1983 claim.[12]

---

[12] Plaintiffs argue that Minor has not asked this Court to review the trial court's decision with regard to the federal Due Process Clause or the state constitutional claims. Since neither the Fourteenth Amendment nor the Georgia Constitution provides any greater protection than does the Eighth Amendment, we need not address this argument. See *Whitley v. Albers*, 475 U. S. 312, 327 (106 SC 1078, 89 LE2d 251) (1986) (in cases involving prison inmates where deliberate use of force is challenged, the Due Process Clause affords no greater protection than the Eighth Amendment); *Edwards v. Gilbert*, 867 F2d 1271, 1274-1275 (11th Cir. 1989) ("[i]n a prisoner suicide case, to prevail under section 1983 for violation of substantive rights, under either the eighth or fourteenth amendment, the plaintiff must show that the jail official displayed 'deliberate indifference' . . ."); *Hamm v. DeKalb County*, 774 F2d 1567, 1574 (11th Cir. 1985).

(b) *Carter*. Carter testified that she overheard Jones and Chandler discussing Barwick's possible overdose and the fact that he had been examined earlier by medical personnel. Sometime after hearing this conversation, Chandler sent Carter to reexamine Barwick. Even though Barwick allegedly denied the overdose to Carter, there is evidence that Davenport told Carter that Barwick had taken 110 Tylenol pills. One inmate also testified that Barwick told Carter that he had overdosed. According to Davenport, Carter concluded that Barwick was fine. Davenport then repeatedly told Carter that Barwick was ill and pleaded with her to transport him to the hospital.

In *Howard*, supra, we found that because jail licensed practical nurses ("LPNs") deliberately ignored the pleas of a diabetic inmate, his cellmates, and deputies either to summon a doctor or to transport the inmate to the hospital, there was a factual question as to whether their response amounted to deliberate indifference:

> As an established policy or practice, the LPNs' examination, treatment, and delay in transfer to a hospital of an obviously critically ill inmate, rather than examination and treatment by a physician, constitute such totally inadequate medical care that a jury may find that it constituted non-treatment.

Id. at 406 (1) (a) (i).

While we recognize certain factual differences between this case and *Howard*, our decision in that case supports our finding here. At a minimum, plaintiffs have presented sufficient evidence from which reasonable jurors could find that Carter refused to act despite knowledge of the substantial risk of harm to Barwick. The facts presented by plaintiffs show more than mere negligence/medical malpractice. Accordingly, the trial court correctly denied Carter's motion for summary judgment on plaintiffs' 42 USC § 1983 claim.

2. *State Claims*. Minor contends the trial court erred in denying his motion for summary judgment on plaintiffs' various state claims, because the Georgia Tort Claims Act ("GTCA"), OCGA § 50-21-25, forbids plaintiffs from pursuing their claims against Minor in his individual capacity. The trial court granted Carter's motion for summary judgment on plaintiffs' state claims and should have done the same for Minor. Plaintiffs do not address this enumeration of error except to argue that Minor never "actually" moved for summary judgment on these claims. We disagree. The record reflects that Minor moved for summary judgment on plaintiffs' state claims against him. Further, in its order, the trial court specifically addressed these claims.

The Georgia Constitution provides:

> Except as specifically provided by the General Assembly in a State Tort Claims Act, all officers and employees of the state or its departments and agencies may be subject to suit and may be liable for injuries and damages caused by the negligent performance of, or negligent failure to perform, their ministerial functions and may be liable for injuries and damages if they act with actual malice or with actual intent to cause injury in the performance of their official functions. Except as provided in this subparagraph, officers and employees of the state or its departments and agencies shall not be subject to suit or liability, and no judgment shall be entered against them, for the performance or nonperformance of their official functions. The provisions of this subparagraph shall not be waived.

Ga. Const., Art. I, Sec. II, Par. IX (d). In 1992, the General Assembly enacted the GTCA, which is codified at OCGA § 50-21-20 et seq. The GTCA is the exclusive remedy for any tort committed by a state officer or employee. OCGA § 50-21-25 provides that,

> [a] state officer or employee who commits a tort while acting within the scope of his or her official duties or employment is not subject to lawsuit or liability therefor. However, nothing in this article shall be construed to give a state officer or employee immunity from suit and liability if it is proved that the officer's or employee's conduct was not within the scope of his or her official duties or employment.

OCGA § 50-21-25 (a).

The immunity provided by the GTCA applies even if the officer acted with malice and intent to injure. See *Ridley v. Johns*, 274 Ga. 241, 242 (552 SE2d 853) (2001). See also *Hardin v. Phillips*, 249 Ga. App. 541 (547 SE2d 565) (2001) (employees of state college, who denied tenure to plaintiff, were entitled to immunity under the GTCA); *Wang v. Moore*, 247 Ga. App. 666 (544 SE2d 486) (2001) (employees of state college, who maliciously fired plaintiff, acted within the scope of their duties and were, therefore, entitled to immunity under the GTCA); *Mattox v. Bailey*, 221 Ga. App. 546 (1) (472 SE2d 130) (1996) (correctional officer who, while escorting a prisoner, slammed that prisoner's head into a door and then beat him was entitled to immunity under the GTCA). In *Ridley*, the Supreme Court reversed our decision in *Johns v. Ridley*, 245 Ga. App. 710 (537 SE2d 746) (2000), finding that neither malice nor intent to injure can strip a state officer of the immunity granted by the GTCA for torts

committed within the scope of that officer's official duties or employment. *Ridley*, supra, 274 Ga. at 243. In that case, the defendant, plaintiff's supervisor at the Heard County Department of Family and Children Services, threatened plaintiff verbally and with his fist, and told her, " 'you screw me in the back again, I'll get you and you won't even know what happened.' " *Johns*, supra at 711 (1).

It is undisputed that Minor was a state employee. Moreover, plaintiffs have failed to prove that Minor was acting outside the scope of his official duties or employment. Consequently, even if Minor acted with malice or intent to injure Barwick, he is immune from liability.[13] Because we find that Minor is entitled to immunity under the GTCA, we reverse the trial court's denial of Minor's motion for summary judgment on plaintiffs' state tort claims.

*Judgment affirmed in part and reversed in part. Johnson, P. J., and Eldridge, J., concur.*

DECIDED NOVEMBER 25, 2003 — 

*Thurbert E. Baker, Attorney General, Kathleen M. Pacious, Deputy Attorney General, Carlock, Copeland, Semler & Stair, Adam L. Appel, Hollberg & Weaver, George M. Weaver, for appellants.*

*Orr & Orr, Kristine E. Orr, E. Wycliffe Orr, Ray & McKinney, Robert M. Ray, Jr., Ralph S. Goldberg, for appellees.*

---

[13] With respect to plaintiffs' claim for wrongful death, the trial court found that Minor was acting within the scope of his employment and performing discretionary acts while dealing with Barwick. However, the trial court found that a question of fact exists as to whether Minor acted with malice or intent to injure Barwick. As we have explained, whether Minor acted with malice or intent to injure is irrelevant. We further point out that since Minor – as a state employee – is entitled to immunity under the GTCA, whether his actions were discretionary or ministerial also is irrelevant.