**THIRD DIVISION**
**MILLER, P. J.,**
**MCFADDEN and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received*** **in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 15, 2016**

# In the Court of Appeals of Georgia

A16A0176. MCKUHEN et al. v. TRANSFORMHEALTHRX, INC.
   et al.

MILLER, Presiding Judge.

On January 23, 2012, Carol McKuhen was arrested and jailed in Effingham County on a probation violation. At 1:30 a.m. on January 30, she was found dead in her isolation cell. An autopsy determined that she died of chronic ethanolism with hypertensive heart disease. Toney McKuhen,[1] Carol's surviving spouse, and Tori and Taylor McKuhen, as co-administrators of Carol's estate, filed a civil action under 42 U.S.C. § 1983 against jail personnel Merlin Ward, John Reinhart, William Gibson,

---

[1] We refer to Carol McKuhen as Carol, and Toney, Tori, and Taylor McKuhen as the McKuhens or appellants.

and Sheriff Jimmy McDuffie,[2] (collectively "Jail Defendants"). The McKuhens also named as defendants TransformHealthRX, Inc. ("THRX"),[3] the service that contracted with Effingham County to provide medical care to inmates, and THRX employees Dr. Myra Pope, nurse Wanda Brady, and Rhonda Brown (collectively "Medical Defendants").[4] The McKuhens alleged that the Medical Defendants committed malpractice and that all defendants were deliberately indifferent to Carol's medical needs, in violation of the Fourteenth Amendment. The trial court granted summary judgment to all of the defendants on all claims, and the McKuhens now appeal, arguing that (1) the trial court improperly excluded their expert affidavit in support of their medical malpractice claims; (2) the Medical Defendants were not entitled to summary judgment on the medical malpractice claims; (3) none of the

---

[2] The McKuhens do not appeal from the trial court's grant of summary judgment to Sheriff McDuffie. Additionally, although the McKuhens initially named a female jailer as a defendant, they indicated at the hearing on the motion for summary judgment that she was not a defendant.

[3] TransformHeathRX has transferred its jail contracts to its sister company, TransformHealthCS. For purposes of this opinion, we refer to TransformHealthRX.

[4] The parties do not dispute that the Medical Defendants were state actors for purposes of § 1983. *West v. Adkins*, 487 U. S. 42, 55-56 (II) (C) (108 SCt 2250, 101 LE2d 40) (1988) (doctors); *Craig v. Floyd County, Ga.*, 643 F3d 1306, 1310 (III) (11th Cir. 2011) (healthcare company).

defendants were entitled to summary judgment on the deliberate-indifference claims; and (4) the trial court erred in denying their motion for spoliation sanctions. Although we find Carol's death to be a tragic event, and one that should not have occurred while in the care of medical and jail staff under these circumstances, after a thorough review of the record, we conclude that the trial did not abuse its discretion by excluding the expert's affidavit, and therefore, the trial court properly granted summary judgment to the Medical Defendants on the malpractice claims. We also must affirm the trial court's grant of summary judgment on the § 1983 claims to all defendants except Dr. Pope. Finally, we reverse the trial court's denial of spoliation sanctions as to the medical records, and remand the case for the trial court to reconsider the spoliation issue in light of the Supreme Court of Georgia's opinion in *Phillips v. Harmon*, 297 Ga. 386, 393-94 (II) (774 SE2d 596) (2015), as well as for further proceedings on the § 1983 claim against Dr. Pope.

"On appeal from the grant of a motion for summary judgment, we conduct a de novo review of the law and evidence, viewing the evidence in the light most favorable to the nonmovant, to determine whether a genuine issue of material fact exists and whether the moving party was entitled to judgment as a matter of law."

(Citation omitted.) *Richard Bowers & Co. v. Creel*, 280 Ga. App. 199, 200 (633 SE2d 555) (2006).

So viewed, the evidence shows that Carol was arrested on a probation violation on January 23, 2012, and booked into the Effingham County jail. The jailer on duty completed a medical questionnaire, noting that Carol was exhibiting signs of alcohol withdrawal and had experienced seizures in the past. Shortly after Carol's arrival, Defendant Wanda Brady, the THRX nurse assigned to provide medical services during the week, conducted an intake evaluation. Nurse Brady noted that Carol had injured her foot, and she vomited on intake. Brady also noted that Carol was an alcoholic who drank 12 to 18 beers a day, she had emphysema, she had a history of alcohol-related seizures, and she was taking Dilantin for seizures. Carol was placed in an isolation cell in the section of the jail called the "horseshoe" so that the defendants could monitor her for any signs of detoxification. Nurse Brady also referred Carol to mental health services, and alerted THRX's assigned physician, Defendant Myra Pope, by phone.

The next day, January 24, 2012, Nurse Brady examined Carol and took her vitals signs. That same day, Dr. Pope wrote a progress note indicating that Carol was starting to sober up and would need to begin detoxing medications "because of

4

impending DTs."[5] Pope instructed the THRX medical staff

---

[5] The Eleventh Circuit has explained alcohol withdrawal and the DTs as follows:

> Chronic alcoholics may suffer from epileptic seizures and/or DTs during withdrawal. . . . DTs is a form of acute organic brain syndrome due to alcoholic withdrawal which is marked by sweating, tremor, atonic dyspepsia, restlessness, anxiety, precordial distress, mental confusion, and hallucinations. The manifestations of alcohol withdrawal in a chronic alcoholic, and the relationship between seizures and DTs, have been explained as follows: Six to eight hours after the last drink, the signs and symptoms of withdrawal appear. They are generally most severe during the first twenty-four hours, then gradually subside during the following 48 to 72 hours. Signs include shaking (tremor) of the arms and hands and sometimes of the tongue and torso. The individual's face is flushed; there is sweating, nystagmus, a small increase in the heart rate (tachycardia), overactive reflexes, nausea and vomiting. Symptoms include subjective feeling states of disorientation, apprehension, and anxiety, as well as insomnia, nightmares, and sometimes hallucinations. There are two variants of the alcohol withdrawal syndrome: alcoholic epilepsy and delirium tremens. In alcoholic epilepsy ("rum fits"), generalized seizures occur with no preceding aura and are often followed by a brief state of

to order the detoxing medications so that they would be available when Carol was in need. Pope, however, did not prescribe Dilantin or any other seizure medication for Carol, and she did not personally examine or observe Carol, even though she was in the facility at that time.

Carol refused to take any medications on January 24, and again on January 25.[6] When Nurse Brady observed Carol during her rounds, she noted that Carol was pacing and refusing to communicate with staff. On January 26, Carol again refused to take her medication, and Brady noted that Carol was speaking loudly and had refused lunch. That same day, Defendant Rhonda Brown, who was hired by THRX to do administrative tasks and distribute medications over the weekend, observed Carol beating her head and shoes against the window of her cell. Brown spoke with

_____

confusion. They occur between seven to 48 hours after the last drink. Delirium tremens is the most severe form of withdrawal. It is experienced by about five percent of alcoholics undergoing withdrawal . . . . It develops about three to five days after the last drink.

(Citations and punctuation omitted.) *Lancaster v. Monroe County, Ala.*, 116 F3d 1419, 1421 (I) (A), n.4 (11th Cir. 1997).

[6] There is some inconsistency in the record as to whether Carol refused her medications on January 25.

her supervisor at THRX and, based on this discussion, Brown ordered that everything be removed from Carol's cell for her own safety. Carol was given only a paper gown and a mattress.

On Friday, January 27, Nurse Brady observed Carol pacing in her cell and talking to herself. She notified Dr. Pope that Carol refused medications again, and as a result, Pope discontinued Carol's medications. Carol refused dinner that evening.

Nursing staff was not in the facility over the weekends, but Brown was on site to distribute medications. Although Carol was not receiving any medications at that point, Brown nevertheless checked on Carol over the weekend. On Saturday, January 28, Brown observed Carol in her cell in no apparent distress, and Carol again refused her meals.

The following day, Brown observed Carol walking around her cell, and noted that Carol was not speaking. Jail staff monitoring Carol noted that she was sitting or standing throughout the morning. That afternoon, Brown noted that Carol was standing in a corner of the cell, and Carol refused to acknowledge or respond when others spoke to her.

Beginning at 5 p.m. on Sunday, January 29, officers Merlin Ward, John Reinhart, and William Gibson were on duty. Gibson was assigned to the horseshoe

unit and was responsible for checking on Carol. Gibson marked his observations on a visual check sheet posted on Carol's door, and he checked on Carol by glancing through the slit window in the door to her cell, but he did not mark down all of his observations. From 8:45 p.m. until 10:45 p.m., Gibson did not enter any observations. At 10:45 p.m., Gibson noted that Carol was quiet and sitting on the floor. Gibson also observed that Carol was naked and shivering, and he witnessed her hand shake as she reached out to touch the wall, but he did not alert anyone to Carol's condition. Gibson further noted that the cell was dirty and smelled of body odor.

At about 11:30 p.m., Gibson moved to the control room. From there, he observed Carol from a window that looked down into her cell. At about 1:30 a.m., Gibson suggested that a female guard take Carol for a shower, which would enable staff to clean the cell. When the female guard approached Carol's cell, Carol was naked and slumped over. The guard called Carol's name several times, with no response. . The guard and another officer then entered the cell and, when the female guard reached for Carol, she found that Carol's entire body was stiff, Carol had no pulse, and Carol's lips were turning blue. None of the guards performed CPR, and Carol was pronounced dead at 2:15 a.m. The medical examiner concluded that the

8

cause of death was cardiac arrest, chronic ethanolism, hypertensive heart disease, and coronary vascular disease.

1. The McKuhens first argue that the trial court erred in finding that their expert witness, Dr. Donald Kern, was not sufficiently qualified to render an expert opinion in support of their medical malpractice claims. After a thorough review of the record, we are constrained to agree with the trial court's conclusion.

> The law in Georgia regarding affidavits in medical malpractice cases is at this moment crystal clear. One set of rules applies when the expert's competency is challenged and a hearing is held; a different set of rules governs the trial court's evaluation of the affidavit when the expert's competency is challenged and no hearing is held. Similarly, the standard of appellate review differs depending on whether the trial court had a hearing on the issue of the expert's competency. It is irrelevant whether or not evidence was offered at the hearing. If there is a hearing on the expert's competence, the trial judge weighs the evidence in the plaintiff's witness's affidavit, or in the competing affidavits, and decides whether the witness qualifies as an expert and whether the expert's testimony satisfies the requirements of [OCGA § 24-7-702 (c)]. When such a hearing has taken place, the trial court's decision is reviewed on appeal for abuse of discretion.

(Punctuation and footnotes omitted.) *Craigo v. Azizi*, 301 Ga. App. 181, 183 (1) (687 SE2d 198) (2009).

9

In order to survive the Medical Defendants' motion to dismiss or for summary judgment on the medical malpractice claims, the McKuhens had to present expert testimony that the Medical Defendants deviated from the applicable standard of care and that such deviation was the proximate cause of the injury. See *MCG Health v. Barton*, 285 Ga. App. 577, 582 (2) (647 SE2d 81) (2007). OCGA § 24-7-702 (c) sets forth the statutory criteria for the qualification of experts in medical malpractice cases. Among other criteria, the statute requires that, within at least three of the last five years,

> the expert must have regularly engaged in the active practice of the area of specialty in which the opinion is to be given and must have done so with sufficient frequency to establish an appropriate level of knowledge in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue.

(Punctuation and footnote omitted.) *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007); see also OCGA § 24-7-702 (c) (2) (A). Moreover, the active practice or teaching must be in the area of diagnosing the condition or rendering the treatment at issue. OCGA § 24-7-702 (c) (2) (B). Finally, a physician can testify to the standard of care for nurses if he or she has "during at least three of the last five

10

years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses." OCGA § 24-7-702 (c) (2) (D); see also *Hankla v. Postell*, 293 Ga. 692, 694-695 (749 SE2d 726) (2013).

In granting the Medical Defendants' motion for summary judgment, the trial court concluded that Kern was not a qualified expert as to any of the Medical Defendants because for three of the last five years he had not practiced, taught, or supervised in the practice area or speciality in which he was giving his expert opinion. Because the deposition testimony enabled the trial court to find that Kern was not a qualified expert under Georgia law, we are constrained to conclude that the trial court did not abuse its discretion.

Here, in his initial and supplemental affidavits, Kern made generalized statements that he specialized in the practice of medicine in correctional facilities, he had actual experience and training in medical care for inmates experiencing alcohol withdrawal, and he provided such care and treatment to inmates on a regular basis for three of the five years before Carol's death. Kern also stated that he supervised, taught, and instructed nurses who provided medical care to patients undergoing alcohol detoxification for the relevant time period.

11

In his deposition, however, Kern provided more specific testimony that contradicted his affidavits. For example, Kern testified, in 2012, as a faculty member at the University of Alabama Birmingham, he taught a class in public health care to master's degree candidates. Kerns's students included doctors and nurses, but he did not specifically teach about alcohol detoxification. Kern further admitted in his deposition that during the five years prior to Carol's death, he did not teach anyone how to monitor or treat inmates going through alcohol withdrawal.

Additionally, Kern testified that in his role with NaphCare, Inc. in Massachusetts, Kern did not provide daily or even regular patient care, and Kern could not estimate the amount of time he spent actually caring for patients. Kern also admitted that in Nevada, he did not directly supervise any nurse in a correctional healthcare setting.

We are constrained by the standard of review in this case. After a hearing, the trial court concluded that Kern did not have the requisite experience in the last three of the five years. Based on Kern's conflicting affidavit and deposition testimony, we must conclude that the trial court did not abuse its discretion in reaching this conclusion and striking Kern's affidavit. *Vaughn v. WellStar Health Sys. Inc.*, 304 Ga. App. 596, 600 (1) (696 SE2d 506) (2010) (in light of the conflicting testimony, the

trial court did not abuse its discretion by excluding expert witness). Nothing in Kern's testimony *requires* a finding that Kern was engaged in active practice or that he taught physicians and nurses for the requisite time period. Moreover, Kern did not regularly supervise medical staff or provide care to inmates experiencing alcohol withdrawal or detoxification for any significant time period or on a regular basis. Compare *Emory-Adventist, Inc. v. Hunter*, 301 Ga. App. 215, 218 (687 SE2d 267) (2009) (testimony that the doctor was involved in decision-making for hospitalized patients on a "regular basis" and "several times a week" was sufficient to meet active practice requirement). Because the trial court is the "gate-keeper of expert testimony," we must defer to the trial court's discretion in determining that Kern was not competent to testify in this case. *Vaughn*, supra, 304 Ga. App. at 600 (1). Therefore, we must conclude that Kern has not met the requirements under § 24-7-702 (c). *Hankla*, supra, 293 Ga. at 695.

Because we conclude that the trial court did not abuse its discretion in finding that Kern's affidavit was insufficient to satisfy OCGA § 24-7-702, the McKuhens have failed to meet the threshold requirement under OCGA § 9-11-9.1 and their medical malpractice claims fail as a matter of law. *James v. Hosp. Auth. of City of Bainbridge*, 278 Ga. App. 657, 658 (1) (629 SE2d 472) (2006) (noting the

13

requirement for an expert's affidavit to bring a medical malpractice claim). We therefore affirm the trial court's grant of summary judgment to Pope, THRX, and Brady on the medical malpractice claims.

Finally, we note that Rhonda Brown was trained as an EMT even though she dispensed medications on the weekend shift. EMT is not one of the professions listed under OCGA § 9-11-9.1 as requiring an expert affidavit. Thus, arguably, the trial court erred by applying the affidavit requirement to the claims against Brown. In any event, the medical malpractice claims against Brown, who was not a medical professional, could not stand, and the McKuhens failed to allege simple negligence claims against this defendant. Cf. *Procter v. Gwinnett Pulmonary Group, P.C.*, 312 Ga. App. 486, 488 (1) (718 SE2d 860) (2011) (negligence claims against technician did not require expert affidavit). Because there is no basis for a medical malpractice claim against a non-medical staff person, and the McKuhens did not allege simple negligence against Brown, the trial court properly granted summary judgment on the medical malpractice claims against Brown.

2. The McKuhens argue that the trial court erred by granting summary judgment to all defendants on their deliberate-indifference claims, brought under 42 U.S.C. § 1983. After a thorough review of the record, we agree in part.

14

The United States Supreme Court has held that:

> [D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed. Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

(Citation and punctuation omitted.) *Minor v. Barwick*, 264 Ga. App. 327, 333 (1) (590 SE2d 754) (2003).[7] "A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Bingham v. Thomas*, 654 F3d 1171, 1176 (11th Cir. 2011); *Youmans v. Gagnon*, 626 F3d 557, 564 (II) (B) (11th Cir. 2010). There is no dispute that alcohol withdrawal is a serious medical need. *Lancaster v. Monroe County, Ala.*, 116 F3d 1419, 1426 (II) (A) (1) (11th Cir. 1997).

---

[7] Because Carol was a pre-trial detainee at the relevant time, her constitutional rights arise from the Due Process Clause of the Fourteenth Amendment rather than under the Eighth Amendment. *Hamm v. DeKalb County*, 774 F2d 1567, 1572 (11th Cir. 1985). In any event, we analyze the claim under the same standards. Id. at 1573-74.

In *Farmer v. Brennan*, 511 U. S. 825 (114 SCt 1970, 128 LE2d 811) (1994), the United States Supreme Court defined the test for determining deliberate indifference:

> a prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

(Citations omitted.) *Farmer*, supra, 511 U. S. at 837. Thus, a prison official may be "deliberately indifferent" so as to give rise to a 42 USC § 1983 action if the official intentionally denies or delays a prisoner's access to medical care and the official's conduct results in substantial harm. See *Estelle v. Gamble*, 429 U. S. 97, 104-106 (II) (97 SCt 285, 50 LE2d 251) (1976).

> [D]eliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence. Therefore, summary judgment must be granted for the defendant official unless the plaintiff presents evidence of the official's subjective knowledge, as follows: since a finding of deliberate indifference requires a finding of the defendant's subjective awareness of the relevant risk, a genuine issue of

16

material fact exists only if the record contains evidence, albeit circumstantial, of such subjective awareness.

(Citation omitted.) *Jackson v. West*, 787 F3d 1345, 1353 (II) (11th Cir. 2015). "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." (Citation omitted.) *Bingham*, supra, 654 F3d at 1176. "Each individual Defendant must be judged separately and on the basis of what that person knows." (Citation omitted.) *Jackson*, supra, 787 F3d at 1353 (II).

a. The Jail Defendants

We begin with the claims against the Jail Defendants. In this case, the trial court concluded that these defendants were entitled to qualified immunity. "Government officials, including [jail personnel], are entitled to immunity from personal liability under 42 USC § 1983 if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Citation omitted.) *Minor*, supra, 264 Ga. App. at 332 (1). We look to whether the official's conduct was objectively reasonable in light of legal rules that were clearly established at the time the action was taken. Id. "The contours of the

17

right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." (Citation omitted.) Id. (II) (B). The McKuhens have the burden of establishing both a constitutional violation and that the law was clearly established at the time of the violation.[8] *Youmans*, supra, 626 F3d at 563 (II) (A).

### i. Gibson

William Gibson was on duty from the evening of January 29 through the morning of January 30 and was responsible for checking on Carol that night. During his shift, he noticed that Carol's cell was empty except for a mattress, and she had ripped up the paper gown she was wearing. When he inquired, Gibson was told that everything had been removed to ensure Carol's safety.

There was a crisis intervention observation sheet outside Carol's door with notations for various behaviors that the jail staff observed. There were notations on January 30 throughout the day until 8:45 p.m. At that time, staff noted that Carol was sitting and talking to herself. From 8:45 p.m. until 10:45 p.m., nothing was noted. Gibson stated in his deposition that he was busy that evening and he simply did not have a chance to note his observations during those times, but he would have looked

---

[8] There is no question here that all of the defendants were performing discretionary functions during their alleged unlawful conduct.

18

in on Carol or glanced through the slit window in the door. Although Gibson merely noted that Carol was sitting quietly at 10:45, he admitted that he observed her sitting on the floor, naked and shivering. Despite witnessing Carol in this manner, Gibson did not alert the medical staff or otherwise seek assistance.[9] Instead, Gibson simply believed that Carol had finally tired herself out. The last notation appears at 10:45 p.m., indicating that Carol was sitting quietly. There are no further observations noted until her death less then three hours later.

Beginning around 11:30 p.m., Gibson was assigned to the control room. From there, he could observe Carol's behavior via the control room window overlooking her cell. Around 1:30 a.m., Gibson observed Carol curled up on the floor and thought she was sleeping. He suggested that a female jailer try to take Carol for a shower because he knew the cell was dirty, he smelled body odor, and taking Carol for a shower would enable staff to clean the cell. Gibson was aware, however, that Carol did not usually respond when staff spoke to her and he thought she "might not be in the correct state of mind" to answer questions from jail staff.

---

[9] There was some evidence in the record to show that Carol's cell was not too cold.

Gibson was not trained to recognize the signs and symptoms of DTs, and he was unaware of the risks associated with alcohol withdrawal or DTs. He stated that he never saw Carol vomiting or sweating, and never saw Carol suffer from a seizure, however, he admittedly saw Carol shivering, and he could see her hand shaking as she reached out to touch the wall. Gibson did not consider this to be a sign of distress, and he stated that, had he noticed Carol in any distress, he would have called his supervisor.

The trial court found that Gibson's conduct did not rise to the level of a constitutional violation. We are deeply troubled by Gibson's failure to intervene, however, we are constrained to agree with the trial court's conclusion.

Gibson was tasked with monitoring Carol on the night leading up to her death. He failed to complete the observation sheet, leaving it unclear whether he actually checked on Carol between 8:45 and 10:45 or between 10:45 and Carol's death. It is possible that, had he observed her during that time, he might have seen symptoms warranting medical intervention. As he admitted, Gibson saw Carol naked and shivering and did nothing. He saw her hand shaking as she reached for the wall and he reported this to no one. Moreover, Gibson admittedly believed that Carol was not in the right frame of mind to communicate with jail officials. Importantly, however,

20

Gibson testified that he was never trained or told what symptoms to look for related to alcohol detoxification and was unaware of the risks involved with alcohol withdrawal. Thus, Gibson's observations did not establish that he subjectively knew that Carol was in serious need of medical attention, and he did not disregard a known risk. Cf. *Harper v. Lawrence County, Ala.*, 592 F3d 1227, 1234 (II) (B) (1) (a) (11th Cir. 2010) (individual jailers were not aware of subjective risk because they did not know that alcoholic inmate was in need of medical attention during his incarceration). Given Gibson's lack of knowledge of the risks in this case, we have no choice but to conclude that these facts, although disturbing, do not show that Gibson acted with anything more than negligence. *Merritt v. Athens Clarke County*, 233 Ga. App. 203, 205 (1) (504 SE2d 41) (1998) (lack of knowledge of medical needs eliminates § 1983 liability).

ii. Reinhart

John Reinhart was a detention officer working the 5 p.m. to 5 a.m. shift on January 29 and 30. When he came on duty, he noticed that Carol was dressed in a yellow paper gown and had only a mattress in her cell. Someone told Reinhart that Carol was on medical watch, and his supervisor, Officer Ward, told him that Carol was going through DTs. Reinhart thought DTs stood for detoxing, he had no training

21

with regard to inmates experiencing alcohol withdrawal or DTs, he was not told what signs or symptoms to look for, and he did not understand the potential risks.

That Sunday, Reinhart was in the control room from about 5 p.m. until about 11:45 p.m. From the control room window, he observed Carol walking around, talking to herself, and feeling the walls. He did not see any evidence of vomiting, sweating, convulsions, or seizures. Carol's paper gown was torn into pieces on the floor, and Reinhart knew that Carol had refused meals over the weekend. Reinhart did not find Carol's behavior unusual because it was common for inmates in isolation to talk to themselves. Nevertheless, he was concerned about Carol and noted her behavior in the log book for other staff to see, and he told his supervisor, Ward.

At about 1:30 a.m., when the female guard found Carol unresponsive, Reinhart ran to the isolation cell. He found Carol on the ground, cold and stiff. Her eyes were cloudy, her lips were blue, and she smelled of urine.

On these facts, we conclude that the trial court properly granted summary judgment to Reinhart because there was no evidence to support a § 1983 claim for deliberate indifference. Reinhart testified that, although he was concerned about Carol, he never saw any signs or symptoms of distress. Because Reinhart did not subjectively know of and disregard the risks to Carol, he cannot be liable for

deliberate indifference, and the § 1983 claims against him were properly denied. *Merritt*, supra, 233 Ga. App. at 205 (I).

### iii. Ward

Merlin Ward supervised Reinhart and Gibson. He knew that Carol was in an isolation cell for medical monitoring because she had DTs. Ward did not, however, know what "DT" stood for, and he received no training in recognizing the symptoms of DTs.

Ward observed Carol on January 28 when he looked in the window to her cell on an hourly basis. Although he noticed that she was not eating and was talking to herself, he was not concerned because it was common for inmates to act in this manner. Ward did not report Carol's behavior because he thought Brown was aware of it, and he noted Carol's behavior in the log book for other shifts. On January 29, Ward noticed that Carol was "quieter." At no time, however, did Ward observe Carol vomiting, sweating, experiencing seizures, or suffering from tremors. Ward testified that if he had seen any signs of distress, he would have called medical staff. On the morning of January 30, Ward accompanied a female guard into Carol's cell. Carol had torn up her paper gown and was naked on the floor. When Carol did not respond to the guards, Ward left the cell to call an ambulance.

23

The trial court concluded that there was no constitutional violation because Ward did not ignore an obvious need for medical care. We agree. As with Gibson and Reinhart, the record does not show that Ward had a subjective knowledge of any risk. He also never observed any conduct that was consistent with the symptoms of DTs. On these facts, we must agree with the trial court that Ward did not act with deliberate indifference toward Carol's medical needs.

In summary, the trial court properly granted summary judgment to the Jail Defendants on the deliberate-indifference claims because the record was devoid of any evidence that they subjectively knew of the risks of alcohol withdrawal, or that they ignored those risks.

b. The Medical Defendants

We turn to the claims against the Medical Defendants.[10] With regard to medical personnel, the U.S. Supreme Court has clarified that, "inadvertent failure to provide adequate medical care" does not rise to the level of a constitutional violation:

---

[10] The trial court's order does not indicate that it denied the claims against the Medical Defendants based on qualified immunity, but reading the trial court's order in its entirety, the trial court analyzed whether the defendants were deliberately indifferent to determine whether there was any violation of a constitutional right for qualified-immunity purposes.

[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner. In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend "evolving standards of decency" in violation of the Eighth Amendment.

(Footnote omitted.) *Estelle*, supra, 429 U. S. at 106 (II).

### i. Wanda Brady

Brady was a licensed practical nurse who began working for THRX in July 2011. She performed the intake evaluation on Carol on January 23. She noted that Carol was an alcoholic with a history of alcohol-related seizures, for which Carol was prescribed Dilantin. In her intake notes, Brady wrote that Carol also suffered from a kidney disorder and was a smoker with emphysema. Brady placed Carol in an isolation cell for monitoring, and she notified Dr. Pope by phone to obtain orders to start medications. Brady also referred Carol for a mental health evaluation.

Although THRX had policies and protocols for handling inmates with alcohol withdrawal, Brady had no experience with inmates suffering from DTs. Brady took orders for medications by phone from Dr. Pope, noting that the doctor ordered

medications for impending DTs. On the morning of January 24, Brady checked Carol's vital signs and Carol refused to take her medications. The following day, Brady noted that Carol took her medications, but Brady admitted that she did not check Carol's vital signs. In fact, Brady could not remember if she even entered Carol's cell that morning or if she just spoke with Carol through the meal flap in the door. In her progress note, Brady wrote that Carol was pacing and that she had tried to communicate with Carol, but it was "difficult to make [Carol] understand."

Carol refused medications again on January 26. She also refused any medical assistance and did not take any meals. Brady took Carol's vital signs that evening and noted that Carol was pacing in her cell and speaking loudly. On January 27, Carol again refused medications and medical assistance. Brady noted that Carol was pacing in her cell and talking to herself. Brady notified Dr. Pope that Carol was refusing her medications, and Dr. Pope discontinued treatment due to Carol's noncompliance. Although Brady knew that Carol had vomited when she was brought into the jail, Brady never saw Carol vomiting, sweating, shaking, anxious, or nervous. Brady also was unaware of any problems with scratching, numbness, headaches, or sensitivity to light or sound, and she would have documented these symptoms if she had known that Carol was experiencing any of them.

26

The trial court found that Brady's actions did not constitute deliberate indifference because Brady took Carol's vital signs several times, regularly checked on Carol, recorded her observations, and noted Carol's history upon admission. We are constrained to conclude the same. There is no evidence in the record that Brady was aware of a risk to Carol's health and deliberately disregarded it.

Although we are concerned that Brady opted to observe Carol from the meal flap in the door and did not enter her cell to take vital signs each day, we cannot say that the actions taken – or even the inaction – rise to the level of deliberate indifference. At no time did Carol exhibit any signs or symptoms that would have alerted Brady that Carol was suffering from DTs or was otherwise in serious need of medical attention. Moreover, Brady identified Carol's alcohol and seizure history in her intake evaluation and thus did not, as the McKuhens argue, fail to inform Dr. Pope of these issues. Based on these facts, we cannot conclude that Brady provided grossly inadequate care or that Brady's care was "so cursory as to amount to no treatment at all." *Bingham*, supra, 654 F3d at 1176. At most, Brady's conduct amounts to negligence, which is not a sufficient basis for a § 1983 action. *Estelle*, supra, 429 U. S. at 105-106.

ii. Rhonda Brown

27

Brown is an EMT who was hired to do administrative tasks and distribute medications over the weekend, and she was not trained to evaluate or identify symptoms of DTs. Brown first saw Carol on the morning of Saturday January 28. Although Carol was not receiving any medications at that time, Brown checked on her and observed her pacing the cell and talking to herself. She was aware that it was common for inmates in isolation to talk to themselves, and Carol did not appear to be in any distress.

Brown admitted that she made an error in recording the medications she administered and that she wrote another inmate's medications on Carol's record. As a result, Brown scratched out the notation and wrote "error." Brown also admitted that she instructed jail staff to remove everything from Carol's cell except the paper gown and mattress after she observed Carol striking her head and shoes on the window. Finally, Brown confirmed that no medical provider saw Carol that weekend leading up to Carol's death.

The trial court concluded that there was no claim for deliberate indifference because the evidence showed that Brown checked on Carol over the weekend and recorded her observations, and the claims, at most, sounded in negligence. We agree.

28

Nothing in this evidence rises to the level of deliberate indifference. *Estelle*, supra, 429 U. S. at 105-106 (II). The McKuhens have failed to show that Brown knew of a risk of serious harm and disregarded that risk.[11] Rather, the evidence shows that Brown observed Carol in no apparent distress. Accordingly, there is no basis for liability under § 1983 against Brown.

### iii. Dr. Myra Pope

Dr. Myra Pope worked for THRX providing on-site chronic and sick care to inmates for half a day each week. Pope was in the facility on January 24, the day after Carol was placed in an isolation cell. Based on the intake information from Brady, Pope determined that they needed to begin a detoxification regimen "because of impending DTs" and withdrawal, which she suspected Carol would experience. Pope, however, did not know that Carol had a history of seizures or that Carol had taken Dilantin in the past, although she admitted that this would have been important to know. Had she known, Dr. Pope would have prescribed Dilantin while Carol was incarcerated. Although Pope never actually saw or physically examined Carol herself,

---

[11] The McKuhens argue that there is a question of fact because the medical records show that Brown did not see Carol over the weekend. Our review of the record, however, demonstrates that Brown looked in on Carol even though she was not prescribed any medications. Thus, the medical records do not create a genuine issue of material fact with respect to Brown's conduct.

29

and she made no clinical assessment, on January 27, Pope discontinued Carol's medications due to Carol's refusal to take them.

Pope explained that an inmate experiencing alcohol withdrawal would likely suffer symptoms that, if untreated, could transition into DTs, which were a serious and life-threatening condition. Dr. Pope knew that a patient experiencing DTs could become incoherent, lose bodily function abilities, and suffer hallucinations requiring hospitalization and sedation. Other symptoms included lack of appetite, agitation, incoherency, and loss of bowel and bladder control. Additionally, difficulty communicating, beating one's head against a window, pacing, disorientation, and talking to one's self were also signs that an inmate was experiencing DTs.

THRX had protocols for handling inmates experiencing alcohol withdrawal, including prescribing medications in decreasing amounts to minimize the symptoms. THRX's policy also required that detoxification be carried out only under medical supervision with physician overview. THRX required its doctors to see and review any inmate showing signs of withdrawal. Doctors were also required to continuously monitor inmates using the Clinical Institute Withdrawal Assessment scale. Medical staff relied on jail staff to help monitor those inmates on a detoxification program,

and jail staff could complete the assessment form. It was also important to have routine vital signs taken and noted in the inmate's records.

The trial court granted summary judgment to Pope, finding that her conduct did not rise to the level of deliberate indifference and instead sounded in medical malpractice. We disagree.

The evidence shows that Pope was on site after Carol was placed in the isolation cell, yet she did not read Brady's full intake notes and she never actually saw or assessed Carol's status. Even after learning that Carol was refusing medications, Pope failed to personally examine or evaluate Carol's condition.

Pope also assumed that jail staff would monitor Carol without ensuring that jail staff knew what signs and symptoms were cause for concern.[12] Pope also ignored the fact that no routine withdrawal assessments were done and that no one took vital signs routinely.

On these facts, we conclude that there is a genuine issues of material fact as to whether Dr. Pope's inaction constituted deliberate indifference. Pope knew of the

---

[12] The trial court granted the Sheriff's motion for summary judgment, and as noted, the McKuhens have not appealed that decision. With the Sheriff no longer a party, this Court is unable to determine the role of the Sheriff's office in the admitted failure to follow THRX's procedures.

life-threatening risks associated with DTs, she anticipated that Carol could experience such symptoms, and yet she failed to follow up with any medical care. Moreover, although THRX policies required physician supervision over detoxification, Pope assumed that jail staff could provide monitoring. Such action – or inaction – rises above mere negligence, and a jury could find that it constitutes grossly inadequate care or was so cursory that it effectively amounted to no treatment at all. See *Bingham*, supra, 654 F3d at 1176 ("grossly inadequate care" and "medical care that is so cursory as to amount to no treatment at all" constitute more than mere negligence). We therefore find that the McKuhens have raised a genuine issue of material fact with regard to Pope's conduct. Moreover, Carol's right to medical treatment for alcohol withdrawal is clearly established. See *Lancaster*, supra, 116 F3d at 1425-1426 (II) (A) (1). Accordingly, we vacate the trial court's grant of summary judgment to Dr. Pope on the § 1983 claim.

iv. THRX

Although THRX is a private entity, "[w]hen a private entity contracts with a county to provide medical services to inmates, it performs a function traditionally within the exclusive prerogative of the state and becomes the functional equivalent of the municipality under section 1983." (Punctuation omitted.) *Craig v. Floyd*

*County, Ga.*, 643 F3d 1306, 1310 (III) (11th Cir. 2011). To establish THRX's liability under § 1983, the McKuhens cannot rely on theories of vicarious liability; instead, they must show a policy or custom that caused the constitutional violation. *Monell v. Dept. of Social Services of the City of New York*, 436 U. S. 658, 690-692 (II) (98 SCt 2018, 56 LE2d 611) (1978). To establish a policy or custom, the McKuhens must show a persistent and wide-spread practice; random or isolated instances will not suffice. *Craig*, supra, 643 F3d at 1310-1311 (III).

Here, Allison Judge, the CEO of THRX, testified that THRX had protocols for handling inmates experiencing detoxification, and such policies included that jail staff would be able to monitor inmates for signs of distress. Kathryn Bryan, the COO of THRX's sister company, testified that, per THRX protocol, jail staff should be trained to recognize issues so that they can notify medical staff when appropriate.

THRX's protocol requires that patients be referred to a physician on the next scheduled visit. Per THRX's policy, inmates could undergo detoxification treatment only under a doctor's supervision, and inmates must be observed by qualified medical staff or trained jail staff. It was the jail's responsibility to have trained staff. Notably, Sheriff McDuffie testified, and Bryan conceded, that jail staff was not trained on symptoms of DTs, and that jail staff would rely on medical personnel.

Bryan admitted that, in the absence of trained jail staff, THRX's policy needed to be changed because inmates at risk required monitoring by people who knew what symptoms were indicative of a problem. She further admitted that, if the doctor or nurse thought an inmate was going through detoxification or DTs, that medical personnel should have spoken to jail staff and alerted them to the symptoms and the need to monitor the inmate.

With respect to Carol's case, Bryan admitted that medical staff was required to use the withdrawal assessment form to monitor Carol's detoxification treatment, but they failed to do so in this case. She further conceded that it was THRX's responsibility to train jail staff, and they failed to do so.

Although these facts show repeated violations of THRX's own policy with respect to Carol's specific treatment, they do not show *a wide-spread custom* involving other inmates. Instead, there is no evidence in the record to show that THRX's failure to adhere to its own policies was anything more than an isolated incident. *Craig*, supra, 643 F3d at 1310-1311 (II) (inmate failed to show that unconstitutional practices were used for any other detainees). Moreover, THRX cannot be vicariously responsible for the failure of its medical staff to train jail staff to recognize signs and symptoms of DTs. *Monell*, supra, 436 U. S. at 690-691.

Accordingly, we agree with the trial court's conclusion that the allegations fail to establish THRX acted with deliberate indifference.

3. Finally, the McKuhens argue that the trial court erred by denying their motion for spoliation sanctions because the Medical Defendants should have been on notice that litigation was possible under the facts of the case.[13] We agree.

> The term spoliation is used to refer to the destruction or failure to preserve evidence that is relevant to contemplated or pending litigation. Such conduct may give rise to the rebuttable presumption that the evidence would have been harmful to the spoliator. However, in order for the injured party to pursue a remedy for spoliation, the spoliating party must have been under a duty to preserve the evidence at issue.

(Citations and punctuation omitted.) *Phillips v. Harmon*, 297 Ga. 386, 393-94 (II) (774 SE2d 596) (2015). "[A] trial court has wide discretion in adjudicating spoliation issues, and such discretion will not be disturbed absent abuse." Id. at 397 (II).

---

[13] Although the McKuhens argued before the trial court that there was spoliation with respect to the destruction of the medical records and a video of the jail hallway, on appeal they only challenge the trial court's denial of spoliation sanctions as to the medical records. Thus, they have abandoned any claim of spoliation of the video. *Headrick v. Stonepark of Dunwoody Unit Owners Ass'n., Inc.,* 331 Ga. App. 772, 780 (5) (771 SE2d 382) (2015).

35

At issue in this case is the destruction of the original copies of Carol's medication administration record. Notably, the electronic format was preserved and turned over to the McKuhens, however, based on markings on the form, the McKuhens argue that Brown falsified that document.

Following the trial court's ruling on the spoliation issue, the Supreme Court of Georgia issued its opinion, in *Phillips*, supra, 297 Ga. at 397 (II), clarifying what "contemplated litigation" involves in the context of spoliation. Because the trial court did not have the benefit of *Phillips* when it ruled in this case, we remand for the trial court to address the spoliation issue in light of *Phillips*. In so concluding, we express no opinion as to the appropriate sanction, if any, in this case. We also note that it is unclear what involvement the remaining defendant, Dr. Pope, had in spoliating the medical records. We leave it to the trial court to address these issues, within its discretion, on remand.

In summary, after a thorough review of the record, we vacate the trial court's grant of summary judgment to Dr. Pope on the McKuhen's § 1983 deliberate-indifference claims, and remand with instructions to allow these claims to proceed. We also vacate the trial court's denial of spoliation sanctions with regard to the medical records, and remand for further proceedings on this issue. We affirm the trial

36

court's grant of summary judgment to Dr. Pope, Wanda Brady, Rhonda Brown, and THRX on the McKuhens' medical malpractice claims, and all the Jail Defendants, Brady, Brown, and THRX on the McKuhens' § 1983 claims.

*Judgment affirmed in part, vacated in part and case remanded. McFadden, J., concurs fully and specially. McMillian, J., concurs specially.*

A16A0176. MCKUHEN et al. v. TRANSFORMHEALTHRX, INC. et al.

MCFADDEN, Judge, concurring fully and specially.

I concur fully. I write separately to respond to a rhetorical question in the Brief of Appellant: "If Dr. Kerns is not an expert about the treatment of inmates undergoing alcohol withdrawal, who is?" «**p. 25** »

As the trial court acknowledged in his detailed and thoughtful order, "Dr. Kerns appears to be at the top of the medical and administrative chain." «**V18, p. 5412**» But as the trial court went on to explain, OCGA § 24-7-702 (c) "seeks to greatly narrow the pool of experts the law deems worthy of testifying in medical malpractice suits, and it seems self-evident that experts with sterling overall

qualifications will be excluded in cases based on the perimeters of frequency and speciality that are statutorily pronounced." «**V18, p. 5415-5416**»

Under that statute the analysis narrows to three of the five years that precede Carol McKuhen's death. It focuses on the particular medical tasks at issue. And teaching and consultation in states where a prospective expert witness is not licensed — even when entirely proper (see OCGA § 43-34-30) — do not count.

The qualities that might have made Dr. Kern a particularly impressive witness — the breadth of his responsibilities and his national stature — have worked against the admissibility of his testimony. They have made it difficult for him to provide the information the trial court needed to make the determination required by the statute.

So the answer to appellant's rhetorical question is: an expert with less stellar qualifications. The sort of expert who can most readily qualify under OCGA § 24-7-702 (c) is one whose responsibilities do not often entail consultations or teaching outside the states where he or she is licensed and who is readily able to quantify his or her experience performing or teaching about the particular medical task at issue.

A16A0176. MCKUHEN et al. v. TRANSFORMHEALTHRX, INC. et al.

MCMILLIAN, Judge, concurring specially.

Although I agree with the result reached and Division 3, I do not agree with all that is said in Divisions 1 and 2; accordingly, this case is physical precedent only with respect to those divisions. See Court of Appeals Rule 33 (a). Further, I write separately as to Division 2 (b) (iii) so as to clarify why I believe that the trial court erred by granting summary judgment to Dr. Pope on appellants' claims under 42 USC § 1983.

Under long-standing federal precedent, jail officials or others charged with an inmate's or detainee's care who are aware that the inmate or detainee may suffer from a severe form of alcohol withdrawal cannot simply ignore such risk until it becomes a "manifest emergency." *Harper v. Lawrence County, Alabama*, 592 F3d 1227, 1235 (II) (B) (1) (b) (11th Cir. 2010), citing *Lancaster v. Monroe County, Alabama*, 116 F3d 1419, 1426 (11th Cir. 1997). Thus, as the majority states, the right to medical treatment under these circumstances is clearly established. And, unlike the other defendants, there is no question that Dr. Pope had subjective knowledge not only that Carol would undergo alcohol withdrawal, but also that her symptoms could progress to the point that she could suffer severe, potentially life threatening, alcohol withdrawal, including the condition known as delirium tremens.

The question then becomes whether Dr. Pope disregarded the risk, and if so, did her conduct pass the high hurdle necessary to show deliberate indifference as opposed to "mere" negligence. *Jackson v. West*, 787 F3d 1345, 1353 (II) (11th Cir. 2015). "Conduct that is more than mere negligence includes: (1) grossly inadequate care; (2) a decision to take an easier but less efficacious course of treatment; and (3) medical care that is so cursory as to amount to no treatment at all." *Bingham v. Thomas*, 654 F3d 1171, 1176 (11th Cir. 2011). Here, I do not believe Dr. Pope

41

initially disregarded the risk; to the contrary, she prescribed Carol appropriate medication to decrease the risk that her alcohol withdrawal would become so severe as to be life-threatening. Thus, as it pertains to the § 1983 claim, and regardless of whether her actions or inactions may have constituted medical negligence, I find it of little import that Dr. Pope did not personally examine Carol or conduct a thorough review of her medical history at the beginning of her detention since she did recognize her condition and prescribe appropriate medication to treat it.

However, I agree with the majority that Dr. Pope's failure to provide any medical care or supervision to Carol after she refused to take her medications, beyond canceling the orders for the medication so the medical personnel at the jail would not have to continue to offer it to her, crossed the line from medical negligence into deliberate indifference. There is no evidence that Dr. Pope made any inquiries about the severity of Carol's alcohol withdrawal symptoms when she was notified that Carol refused to take her medications or that she notified the staff to be alert for such worsening symptoms, even though Carol was at the point in time when her withdrawal symptoms could become more severe. Nor is there any evidence that Dr. Pope made any other effort to ascertain Carol's condition, either by examining her or questioning the staff about her condition, at any point after Carol quit taking the

42

medication. Dr. Pope had the responsibility of undertaking such supervision under the THRX "specific protocols" for inmates undergoing withdrawal, which also required that inmates experiencing severe, life-threatening alcohol withdrawal be transferred immediately to a medical facility. Thus, although it is true, as Dr. Pope testified in her deposition, that she could not force Carol to take her medications, that does not mean she could become indifferent to Carol's condition if she refused the prescribed medication, or that she could not have taken other steps, such as having her transported to a medical care facility for treatment. Accordingly, I agree with the majority that under these facts, it is for a jury to determine if Dr. Pope's actions or failure to act constituted grossly inadequate care or medical care that was so cursory as to amount to no treatment at all.