**SECOND DIVISION**
**MILLER, P. J.,**
**HODGES and PIPKIN, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
https://www.gaappeals.us/rules

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**July 1, 2021**

# In the Court of Appeals of Georgia

A21A0578. STEPHANIE ORR et al. v. SSC ATLANTA OPERATING COMPANY d/b/a NORTHEAST ATLANTA HEALTH AND REHABILITATION CENTER.

PIPKIN, Judge.

In this medical malpractice case, Appellant Stephanie Orr[1] appeals the disqualification of two of her expert witnesses and the grant of summary judgment in favor of Appellee SSC Atlanta Operating Company, LLC d/b/a Northeast Atlanta Health and Rehabilitation Center ("NAHR"). While we conclude that the trial court did not abuse its discretion in disqualifying Orr's expert witnesses, we also conclude

---

[1]Appellant is pursuing this action individually, as administrator of the estate of her mother Rhonda Missouri Orr, and as the executrix of the estate of her father Otha Orr. While Orr was not the original plaintiff in this matter, there has been no argument that she was not properly substituted following the death of the original plaintiff; accordingly, we attribute various actions and pleadings to Orr as a party even though she may not have been the litigant at the time of the filing.

that the trial court failed to properly consider the expert testimony of Orr's remaining expert witness when deciding summary judgment; accordingly, we affirm in part and reverse in part.

In February 2014, Rhonda Orr ("decedent"), had surgery to repair the quadriceps tendon in her right knee. The decedent eventually developed an infection in her knee and was readmitted to the hospital for additional surgical procedures; on June 25, 2014, she was admitted to NAHR by her attending physician, Sam Qingshuang Peng, M.D., for further recovery and convalescence. On July 16, 2014, the decedent became unresponsive after experiencing shortness of breath and a decrease in her oxygen saturation; she was transported to the hospital and died that same day.

The complaint that followed alleges, as relevant here, that the decedent's cause of death was a pulmonary thromboembolus ("PE") resulting from a dislodged deep-vein thrombosis ("DVT"). According to the complaint – which asserts claims of both negligence and wrongful death – Dr. Peng failed to recognize that the decedent's mobility was comprised while at NAHR, putting her at risk for a DVT, and failed to "provide proper prophylaxis against the development of [a] DVT[] by prescribing an oral or injectable anticoagulant medication." With respect to NAHR – which is the

2

sole defendant who is party to this appeal – the complaint similarly alleges that the nurses at the facility failed to appreciate the decedent's risk of DVT, failed to report the decedent's immobility to the relevant physicians, and failed to institute a DVT prophylaxis protocol. Attached to the complaint was an affidavit of Richard Bonfiglio, M.D., who opined, in relevant part, that the decedent's care by the NAHR nursing staff "fell below the minimum care and treatment required of nurses generally, under like conditions or similar circumstances." Later, Orr supported her claims by offering deposition testimony from three medical providers, Dr. Bonfiglio, Thomas DeMarini, M.D., and Nurse Ethel Willis, RN, BSN, MSN.

NAHR later moved to disqualify Dr. Bonfiglio and Nurse Willis on the basis that neither witness had "the requisite knowledge of the nursing standard of care under the circumstances at issue" as required by OCGA § 24-7-702; NAHR also moved for summary judgment. The trial court granted NAHR's motion to dismiss and granted summary judgment in favor of NAHR, concluding that "without Dr. Bonfiglio's and Nurse Willis' . . . testimony, [Orr] [was] unable to establish that [NAHR's] nursing employees or agents breached the applicable standard of care." The trial court alternatively concluded that, even considering the testimonies of Dr. Bonfiglio and Nurse Willis, there was "no evidence that NAHR nurses breached any

3

legal duty that proximately caused [the decedent's] damages," namely, that there was nothing in the record to suggest that any act or omission by the NAHR nurses contributed either to Dr. Peng's allegedly negligent course of treatment or could have altered its outcome. Orr now appeals, arguing that it was error for the trial court to disqualify her witnesses and grant summary judgment.

1. We first turn to the trial court's ruling on Orr's expert witnesses, the admissibility of which is controlled by OCGA § 24-7-702 ("Rule 702"). See *Dubois v. Brantley*, 297 Ga. 575, 580 (2) (775 SE2d 512) (2015). At issue here are various portions of subsection (c) of Rule 702, which establish the requirements "for the admission of expert testimony about the applicable malpractice cases, including medical malpractice cases." *Dubois*, 297 Ga. at 580 (2). As relevant here, Rule 702 (c) provides as follows:

> (c) [I]n professional malpractice actions, the opinions of an expert, who is otherwise qualified as to the acceptable standard of conduct of the professional whose conduct is at issue, shall be admissible only if, at the time the act or omission is alleged to have occurred, such expert:
>
> . . .
>
> (2) In the case of a medical malpractice action, had actual professional knowledge and experience in the area of practice or specialty in which the opinion is to be given as the result of having been regularly engaged in:

4

(A) The active practice of such area of specialty of his or her profession for at least three of the last five years, with sufficient frequency to establish an appropriate level of knowledge, as determined by the judge, in performing the procedure, diagnosing the condition, or rendering the treatment which is alleged to have been performed or rendered negligently by the defendant whose conduct is at issue

. . .

(C) Except as provided in subparagraph (D) of this paragraph:

(i) Is a member of the same profession;

. . .

(D) Notwithstanding any other provision of this Code section, an expert who is a physician and, as a result of having, during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses, . . . has knowledge of the standard of care of that health care provider under the circumstances at issue shall be competent to testify as to the standard of that health care provider.

To determine whether an expert is qualified under this provision, Georgia courts examine "both the area of specialty at issue and what procedure or treatment was alleged to have been negligently performed," *Anderson v. Mountain Mgmt. Svcs., Inc.*, 306 Ga. App. 412, 414 (1) (702 SE2d 462) (2010), both of which are dictated by the complaint. Id. See also *Dubois*, 297 Ga. at 588 (2) (looking to complaint to consider the scope of alleged negligence); *Graham v. Reynolds*, 343 Ga. App. 274, 278 (2) (b) (807 SE2d 39) (2017) (same). The admission of expert testimony is left to the sound discretion of the trial court. *Graham*, 343 Ga. App. at 276 (2).

With respect to NAHR, the complaint alleges that the care provided by the nurses at that facility

> fell below the standard of minimum care and treatment required of nurses in a rehabilitation facility in at least the following respects: (1) failing to recognize that [decedent's] mobility was compromised by her recent leg surgery, putting her at risk for DVTs; (2) failing to notify the staff physician of [decedent's] ongoing immobility; and (3) failing to institute a DVT prophylaxis protocol.

Thus, based on the allegations as set out by Orr in her complaint, the question here is what evidence was before the trial that Dr. Bonfiglio and Nurse Willis were

qualified to opine on the standard of care of nurses pertaining to DVT risks in patients at a rehabilitation facility.[2]

(a) With respect to Dr. Bonfiglio, there is no evidence from either his original affidavit or his deposition testimony that he is a physician who "during at least three of the last five years immediately preceding the time the act or omission is alleged to have occurred, supervised, taught, or instructed nurses." Rule 702 (c) (2) (D). While the evidence is plain that Dr. Bonfiglio has extensive knowledge and experience in rehabilitation medicine, and while his deposition testimony references his

---

[2] After the trial court entered its order disqualifying Dr. Bonfiglio and Nurse Willis and granting summary judgment to NAHR, Orr moved for reconsideration, attaching to that motion additional affidavits from the two experts in an effort to demonstrate their qualifications. The trial court denied the motion and refused to consider the "new evidence that was not timely presented to Defendants and to the [trial] [c]ourt." Apparently undeterred by the trial court's ruling, Orr relies on these supplemental affidavits on appeal as evidence of the qualifications of her experts. We, however, do not consider these affidavits.

As the trial court properly noted, it was Orr's responsibility to present her case in full at the hearing on the motion for summary judgment. See *Patel v. Kensington Community Assn., Inc.*, 340 Ga. App. 896, 898 (1) (797 SE2d 235) (2017). While Orr was plainly put on notice that NAHR was challenging the qualifications of her experts, there is nothing in the record showing that, in the months between the NAHR's motions and the trial court ruling's, Orr took any steps to revise or supplement the testimony presented by either Dr. Bonfiglio or Nurse Willis. Under these circumstances, the trial court did not abuse its discretion in denying the motion for reconsideration and refusing to consider the attached affidavits. See *Edokpolor v. Grady Mem. Hosp. Corp.*, 347 Ga. App. 285, 288-289 (2) (819 SE2d 92) (2018).

"interactions" with nurses as a "normal part of medical practice" – as well as some lectures given to nurses – he expressly testified that he had not recently supervised nurses and, in fact, had not done so in over a decade. Even if it could be said that Dr. Bonfiglios's affidavit and deposition create a question concerning his supervision of nurses, the trial court, acting as gate keeper, was authorized to resolve this conflict to conclude that Dr. Bonfiglio's experience was insufficient to satisfy the statutory requirements. See *Vaughan v. WellStar Health Systems, Inc.*, 304 Ga. App. 596, 600 (1) (696 SE2d 506) (2010), overruled on other grounds, *Lee v. Smith*, 307 Ga. 815, 823 (2) (838 SE2d 870) (2020). See also *McKuhen v. TransformHealthRX, Inc.*, 338 Ga. App. 354, 360 (1) (790 SE2d 122) (2016) (physical precedent only). Thus the trial court did not abuse its discretion with respect to Dr. Bonfiglio.

(b) With respect to Nurse Willis, Orr argues on appeal that she was competent to testify concerning the "management of a rehabilitation patient at risk for DVT" and that Nurse Willis has "experience caring for patients at risk of DVT within 3 of the 5 years prior to 2014." Assuming for the sake of argument that these are accurate

characterizations of what is alleged in the complaint – which is questionable – there is no evidence supporting these conclusions.[3]

While Nurse Willis began working for a long-term care facility around the time of the decedent's death, Nurse Willis' curriculum vitae and deposition testimony reflect that, in the relevant time frame preceding the incident in this case, Nurse Willis was employed at an outpatient facility working in endocrinology and nephrology. It is true that Nurse Willis' employment in a different speciality area does not exclude her from consideration here, *Dubois*, 297 Ga. at 584-586 (2), but there is nothing in either Nurse Willis' testimony or her curriculum vitae to suggest that her employment at this outpatient facility involved, as she says, the "management" or "care" of a "rehabilitation patient at risk for DVT" or that this employment reflects experience and knowledge of the same.

---

[3] Lurking in the background that has gone unaddressed by the parties is whether the relevant nurses at NAHR were registered nurses ("RN"), licensed practical nurses ("LPN"), or a mix of both. Nurse Willis is an RN, and Orr's brief refers to the nursing standards related to RNs , but it appears from the record and oral argument that this case involves a mix of both. This is notable because, as Nurse Willis explained in her deposition testimony, the standard of care may differ depending on the relevant nursing qualification. However, we need not resolve this question to address the disqualification of Orr's experts or the propriety of summary judgment.

Likewise, though Nurse Willis' curriculum vitae reflects that, during the relevant time frame before the decedent's death, she worked for a health care service that "provided long term acute care," Orr points to no deposition testimony – and we can find none – that would show how Nurse Willis' employment with this service evidences the requisite knowledge and skill pertaining to the "management of a rehabilitation patient at risk for DVT." In short, while the evidence might show that Nurse Willis is generally qualified to opine as to the acceptable standard of conduct of the professional whose conduct is at issue, Rule 702 (c), "it is not sufficient that the expert have just a minimum level of knowledge in the area in which the opinion is to be given." *Nathans v. Diamond*, 282 Ga. 804, 806 (1) (654 SE2d 121) (2007). Instead, "the issue is whether the expert has knowledge and experience in the practice or specialty that is relevant to the acts or omissions that the plaintiff alleges constitute malpractice and caused the plaintiff's injuries." (Citations and punctuation omitted.) *Houston v. Phoebe Putney Mem. Hosp. Inc.*, 295 Ga. App. 674, 679 (673 SE2d 54) (2009). Here, given the absence of evidence or testimony concerning Nurse Willis' care or management of rehabilitation patients at risk for DVT, the trial court did not abuse its discretion in concluding that she was not qualified to tender an expert opinion.

2. Finally, while we agree that the trial court properly disqualified Dr. Bonfiglio and Nurse Willis, we agree with Orr that the trial court erred in granting summary judgment on the issue of causation.

Under our well-established standard,

> [s]ummary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Furthermore, a de novo standard of review applies to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant. And at the summary-judgment stage, we do not resolve disputed facts, reconcile the issues, weigh the evidence, or determine its credibility, as those matters must be submitted to a jury for resolution.

(Citations, punctuation, and footnotes omitted.) *Pneumo Abex, LLC v. Long*, 357 Ga. App. 17, 19 (849 (SE2d 746) (2020). Here, the trial court concluded that as to Orr's claim that the NAHR "nurses failed to adequately communicate [the decedent's] condition to Dr. Peng, there is nothing in the record from which a jury could conclude that any additional information would have caused Dr. Peng to change his treatment of [the decedent] or resulted in a different outcome." In reaching this conclusion, the

11

trial court seems to have weighed evidence rather than address whether there are relevant fact questions for the jury.

In his deposition, Dr. Peng testified about the decedent's risk of a DVT, as well as the risks associated with the use of anticoagulants to prevent a DVT. While Dr. Peng recognized that the decedent had numerous risk factors for the development of a DVT – such as recent surgery, infection, and obesity – Dr. Peng initially assessed the decedent's risk of a DVT to be low, not least of which because he believed that she was largely mobile; indeed, Dr. Peng considered the decedent to be a fall risk and was concerned that anticoagulants could amplify any resulting injures. Looking at Dr. Peng's deposition in a light most favorable to Orr, the physician understood that immobility was "a pretty significant factor" in considering DVT risk , but Dr. Peng was seemingly unaware that the decedent had, as Dr. Thomas DeMarini testified,[4] become immobile and bed bound .[5] Dr. DeMarini testified in his deposition that it was incumbent upon the nurses at NAHR to relay the decedent's immobility to Dr. Peng.

_____

[4] While the trial court questioned the credibility of Dr. DeMarini, the trial court did not disqualify him as an expert witness. In fact, the trial court seemingly failed to consider Dr. DeMarini's deposition testimony at all.

[5] There may be a fact question as to the level of the decedent's immobility, but we review the evidence in a light most favorable to Orr.

12

NAHR argues that any such failure to communicate did not contribute to the decedent's death because Dr. Peng was independently evaluating the decedent and assessing her need for anticoagulants. In fact, NAHR goes so far as to argue that "the evidence is clear that Dr. Peng was fully aware of [the decedent's] DVT risk factors" and made his medical determination based on this information. This position discounts the summary judgment standard and mischaracterizes the record. Again, Dr. Peng's deposition testimony suggests that, despite his periodic visits with the decedent, Dr. Peng remained unaware of the extent of the decedent's immobility and would have relied on the NAHR staff for any such updates.[6] Indeed, Dr. Peng testified that he would have relied on the "rehab people" to "let [him] know" about a change in a patient's "level of functioning." According to Dr. Peng, "usually, if the patient condition change[s], the nurse would call [him]," and he relied on these reports because he was only at the facility "two or three times a week."

NAHR persists, arguing further that any alleged failure to communicate would not have changed Dr. Peng's course of treatment. However, whether proper communication concerning the decedent's mobility would have altered Dr. Peng's

---

[6] Indeed, even though Dr. Peng ordered tests after the decedent exhibited classic symptoms of a DVT, he doubted it was a DVT and remained convinced that her risk for a DVT was low.

course of treatment also presents a fact question. Dr. Peng's testimony suggests that, depending on the circumstances, he would prescribe anticoagulants and described the decision as a "clinical call." Indeed, when prompted, Dr. Peng explained during his deposition testimony that

> [i]f a patient has, you know, a significant, you know, mobility issue, she cannot move at all or she has a severe, you know, a severe – a – significant surgery which prevent[s] her to – her or him to move around, or patient that has other comorbidity which had put the patient at potential risk to develop DVT, I'm going to start the anticoagulation.

Thus, given Dr. Peng's willingness to prescribe anticoagulant therapies, his appreciation of the decedent's pre-existing risk factors for DVT, and his understanding of the "significant" DVT risk associated with immobility, it would be reasonable to conclude – as Dr. DeMarini did in his deposition testimony – that nursing reports concerning the decedent's immobility would have prompted Dr. Peng to administer anticoagulant medication, which would have significantly reduced the decedent's risk of a DVT.

In the end, while there may be questions concerning Dr. Peng's role in the decedent's death – questions that are not before this Court and that we need not decide – "proximate cause is generally an issue for the jury, and there may be more

14

than one proximate cause of an injury in cases involving the concurrent negligence of several actors." *Knight v. Roberts*, 316 Ga. App. 599, 608 (1) (b) (730 SE2d 78) (2012).

*Judgment affirmed in part and reversed in part. Miller, P. J., and Hodges, J., concur.*